

**FILED**
11/9/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint      AUSA Nicholas J. Eichenseer (312) 353-1412

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

DENNIS W. HAGGERTY, JR.

**UNDER SEAL**

CASE NUMBER:     **20 CR 789**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. From on or about March 29, 2020, to the present, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1343 | knowingly devised, intended to devise, and participated in, a scheme to defraud Hospital A and Hospital B, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises and, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of a wire communication in interstate commerce certain writings, signs, and signals. |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*Mary C. Harris*

MARY C. HARRIS
Special Agent, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: November 9, 2020

*Judge's signature*

City and state: Chicago, Illinois

JEFFREY COLE, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, MARY C. HARRIS, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed 10 years. My current responsibilities include the investigation of white collar crime, including mail, wire, and bank fraud. I have participated in the execution of multiple federal search warrants, including warrants for searches of businesses, residences, and cellular phones, as well as the execution of multiple federal seizure warrants.

2.     This affidavit is submitted in support of (1) a criminal complaint setting forth probable cause that Dennis W. HAGGERTY, Jr. has violated Title 18, United States Code, Section 1343; (2) applications for warrants to seize and preserve for forfeiture a 2013 Maserati Granturismo bearing VIN ZAM45MMA5D0067899 (**"Subject Vehicle 1"**), a 2015 Land Rover Range Rover bearing VIN SALGS3TF7FA223609 (**"Subject Vehicle 2"**), and a 2017 Maserati Ghibli bearing VIN ZAM57RTL3H1228801 (**"Subject Vehicle 3,"**) (together, the **"Subject Vehicles"**), (3) applications for warrants to seize and preserve for forfeiture funds not to exceed a combined total of $2,658,825 located in the Fifth Third Bank account ending in XXXXXX9072 (**"Subject Account 1"**), the Fifth Third Bank account ending in XXXXXX0852 (**"Subject Account 2"**), and the Fifth Third Bank account ending

in XXXXXX2630 ("**Subject Account 3**,") (together, the "**Subject Accounts**"), and (4) an application for a warrant to search the business located in Willowbrook, Illinois at 7656 Plaza Court ("**Subject Premises 1**") and 7660 Plaza Court ("**Subject Premises 2**) (together, the "**Subject Premises**"), further described in Attachments A-1 and A-2.

3.     Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of (1) a criminal complaint charging HAGGERTY with wire fraud, (2) applications for warrants to seize the **Subject Vehicles** and **Subject Accounts**, and to search the **Subject Premises**, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that (1) the defendant committed the offense alleged in the complaint, (2) that the **Subject Vehicles** and **Subject Accounts** are property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from the defendant's wire fraud offense, and thus subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(D) and (b)(3), and (3) that evidence, fruits, and instrumentalities of that offense are located at the **Subject Premises**.

4.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents and from persons with knowledge of relevant facts, and my training and experience as an FBI special agent.

## FACTS SUPPORTING PROBABLE CAUSE

### Summary

5.    As described below, in the spring of 2020 and in response to the COVID-19 pandemic, two large university hospitals ordered a combined one million 3M N95 face masks from At Diagnostics Inc., which was partially controlled by Dennis W. HAGGERTY Jr. As a deposit on the masks, the hospitals paid over $3 million into a bank account HAGGERTY falsely represented as an At Diagnostics account and for which HAGGERTY was the sole signatory (**Subject Account 1**). HAGGERTY used at least part of the hospitals' funds for his own personal benefit, including to purchase the **Subject Vehicles**, pay credit card bills, withdraw cash, and transfer funds between the **Subject Accounts**.

6.    When At Diagnostics failed to deliver the masks on time, both hospitals cancelled their orders and demanded that At Diagnostics and HAGGERTY refund their money. HAGGERTY falsely claimed to one hospital that HAGGERTY's bank had no record of the hospital's $2,495,000 wire transfer being received. When HAGGERTY's business partners confronted him about the whereabouts of that hospital's money, HAGGERTY altered a bank statement to make it appear as if the wire had never been received into **Subject Account 1**. To date, HAGGERTY has failed to return approximately $2,658,825 paid into **Subject Account 1** by the hospitals for masks that were never delivered. HAGGERTY still maintains and uses the **Subject Premises** as an office.

3

## Legal Authority for Seizure and Forfeiture

7. Title 18, United States Code, Section 981(a)(1) and (b)(3) authorize civil forfeiture of property, real or personal, which constitutes or is derived from proceeds traceable to a violation of, among other offenses, Title 18, United States Code, Section 1343 (Wire Fraud), pursuant to a seizure warrant in any district in which an act or omission giving rise to the forfeiture occurred.

8. Title 18, United States Code, Section 984 permits civil forfeiture of fungible property such as cash or monetary instruments in bearer form. Specifically, it permits the forfeiture of fungible property without directly tracing the property to the criminal offenses if such funds are seized from the same account as the property involved in the offense so long as the forfeiture action is commenced within one year from the date of the offense.

9. Title 28, United States Code, Section 2461(c) provides that if a person is charged and convicted in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, a court shall order as part of the defendant's sentence, the forfeiture of any such property that is authorized by the violation for which the defendant was convicted and notice of intent to seek forfeiture was provided by the government.

4

## Relevant Entities and Individuals

10.    Hospital A is a public teaching hospital located on the campus of University A, a large public university located in Iowa City, Iowa. Hospital A is affiliated with University A and employs over approximately 10,000 people.

11.    Hospital B is a teaching hospital located on the Chicago, Illinois campus of University B. Hospital B employs over approximately 7,000 people.

12.    According to Illinois Secretary of State records, HAGGERTY is a member or officer of several corporations, including At Media Inc.

13.    According to Delaware Secretary of State records and a board member of At Diagnostics Holding LLC ("At Diagnostics") who is a licensed attorney in Illinois ("Partner A"), At Diagnostics is a Delaware limited liability company based in Rolling Meadows, Illinois. At Diagnostics, which was formed on about March 23, 2020, was engaged in the business of selling personal protective equipment, also known as PPE. From on or about March 23, 2020 until in or around July 2020, Partner A and HAGGERTY were At Diagnostic's board managers and officers, and another individual ("Partner B") was an officer. According to Partner A, profits from the company's sales of PPE were to be split between HAGGERTY, Partner A, and Partner B.

14.    According to Illinois Secretary of State Records and a publicly-available LinkedIn profile for "Dennis Haggerty," At Media Inc. is an Illinois corporation for which HAGGERTY is the president and secretary. According to law enforcement

surveillance and Partner A and Partner B, HAGGERTY maintains an At Media office at the **Subject Premises**. According to At Diagnostics corporate documents and Partner A, At Media was an initial and managing member of At Diagnostics.

### Hospital A's $2,495,000 Order for PPE

15.     According to Hospital A representatives, in or around late March 2020, in response to the COVID-19 pandemic, Hospital A representatives were looking to quickly secure large quantities of PPE for staff and patients.

16.     According to Partner A, on or about March 28, 2020, Partner A was hospitalized in Florida after being diagnosed with COVID-19.

17.     According to a Hospital A vice president ("Hospital A VP"), on or about March 29, 2020, Partner B spoke to Hospital A VP over the phone and stated that At Diagnostics could obtain a significant quantity of 3M N95 #8210 face masks for Hospital A by the end of that week. According to 3M's website, the 8210 model N95 particulate respirator mask has emergency use authorization for healthcare professionals.[1]

18.     Shortly after the phone call, according to Hospital A VP and email records,[2] Hospital A VP emailed a fulfillment request letter to At Diagnostics,

---

[1] https://www.3m.com/3M/en_US/company-us/all-3m-products/~/3M-Particulate-Respirator-8210-N95-160-EA-Case/?N=5002385+8709322+8711405+8720539+8720542+8720774+8729337+3294780268&rt=rud (last visited November 6, 2020)

[2] The emails and text messages referenced in this affidavit include emails and text messages produced to law enforcement by Hospital A, Hospital B, and At Diagnostics. The text messages include individual and group text exchanges between and among HAGGERTY,

6

addressed to Partner B. The letter's subject line read "COVID-19 Urgent 3M 95 Purchase Critical Services Provider Request." In the letter, Hospital A requested 500,000 3M 95 #8210 masks at $4.99 a piece, and further requested "to secure the timely delivery of this purchase with utmost urgency." The letter stated that the total $2,495,000 purchase price "will be delivered upon receipt of our purchase order and confirmation of acceptance."

19. Later that same day, according to Hospital A VP, email records, and text messages, Partner B emailed Hospital A VP a purchase agreement on At Diagnostics letterhead. The agreement listed 500,000 3M N95 masks at $4.99 each, for a total of $2,495,000, and April 6, 2020 as the delivery date. Under "payment," the agreement stated, "Escrow," and that "[e]scrow funds will be released upon delivery of products." The agreement listed HAGGERTY as the person to contact with questions and listed HAGGERTY's phone number and the email address dennis@atdiagnostics.com ("Haggerty Email 1"). According to email records, the Hospital A purchase order listed At Diagnostics as the vendor, and the **Subject Premises** as the vendor's address.

20. According to Hospital A VP, Hospital A VP understood that, under Hospital A's purchase agreement with At Diagnostics, Hospital A would deposit the $2,495,000 into an escrow account, with the full amount to be released to At

---

Partner A, Partner B, and Hospital A VP that were preserved and consensually retrieved from the cellular phones used by Partner A and Partner B.

Diagnostics upon delivery of the masks to Hospital A. According to Hospital A VP, and email records, Hospital A VP signed the At Diagnostics purchase agreement on or about March 30, 2020 and sent the signed version via email to Partner B at approximately 9:24 a.m.

21.    On or about the same day, at approximately 2:17 p.m., Hospital A VP texted Partner B that Hospital A VP needed "payment information," to which Partner B replied, "I'll get payment instructions now." According to Partner B, Partner B contacted HAGGERTY and asked him to provide an invoice template and wiring instructions. Telephone toll records obtained from AT&T for phone number (XXX) XXX-4070, which was used by HAGGERTY ("Haggerty Phone 1"),[3] show multiple phone calls with the phone number used by Partner B on March 29, 2020.

22.    The next day, on or about March 30, 2020, at approximately 2:17 p.m., HAGGERTY, using Haggerty Email 1, sent an email to Partner B containing a $2,495,000 invoice for Hospital A for 500,000 3M N95 masks, with the balance due that same day. The invoice instructed Hospital A to wire the invoice balance to:

At Diagnostics

[3] Law enforcement identified HAGGERTY as the user of Haggerty Phone 1 and Haggerty Email 1 based on the following: (1) phone subscriber records show that the phone number was registered in the name of HAGGERTY's spouse, and Partner A and Partner B identified Haggerty Phone 1 as a phone number used by HAGGERTY; (2) text messages to, and later replies from, the user of Haggerty Phone 1 addressed to "Dennis," HAGGERTY's first name; (3) a text exchange in which the user of Haggerty Phone 1 texted an image of what appears to be HAGGERTY's Illinois driver's license; (4) At Diagnostics, Paymode, and other records showing that HAGGERTY provided Haggerty Phone 1 as his phone number and Haggerty Email 1 as his email address; (5) emails from Haggerty Email 1 contained the signature line: "Dennis W. Haggerty Jr., Managing Director" and list Haggerty Phone 1 as HAGGERTY's cellular phone number.

8

Fifth Third Bank
RT # XXXXXX09
Acct # XXXXXX9072.

According to records subpoenaed from Fifth Third bank, the name on the 9072 account is "At Media Inc" (**"Subject Account 1"**), HAGGERTY is the sole signatory for **Subject Account 1.** Additionally, according to Fifth Third Bank, as of March 30, 2020, there were no accounts at Fifth Third in the name of "At Diagnostics" associated with HAGGERTY.

23.    About an hour later, at approximately 3:14 p.m., Partner B emailed Hospital A VP the invoice and wiring instructions that Partner B just received from HAGGERTY. According to Partner B, HAGGERTY told Partner B that, while Partner A was hospitalized, HAGGERTY opened a new Fifth Third bank account in the name of At Diagnostics. Partner B believed HAGGERTY was referring to the 9072 account (**Subject Account 1**) HAGGERTY listed in the invoice to Hospital A. The invoice listed the street address for **Subject Premises 1** as At Diagnostic's office address.

24.    A short while later, according to Hospital A VP and Partner B, Hospital A VP informed Partner B that Hospital A was having problems wiring funds to **Subject Account 1** because, according to a text message Hospital A VP sent to Partner B that afternoon, "[w]e are having issues with the bank routing number [the routing number HAGGERTY included on the March 30, 2020 invoice][4] . . . It's not

_____

[4] At various points in the affidavit, I have included in brackets my interpretation of words and phrases used in text and email communications. My interpretations are based on information received from the contents and context of the communications, events that took place before and after the communications, my knowledge of the investigation as a whole, my

9

valid for a wire [transfer from Hospital A to **Subject Account 1**]. Maybe you were expecting ACH [an ACH or Automated Clearing House transfer]." Partner B replied, "Ok, let's do the wire route [rather than ACH] . . . sending you wire number now via email."

25.     According to Partner B, at or around the time of this text exchange with Hospital A VP, Partner B spoke to HAGGERTY on the phone about the bank information Hospital A needed to wire the funds to At Diagnostics. Telephone toll records for the afternoon of March 30, 2020 show calls between the phone numbers used by Partner B and Haggerty Phone 1.

26.     Later that afternoon, at approximately 4:58 p.m., according to email records and Hospital A VP, HAGGERTY, using Haggerty Email 1, emailed routing number XXXXX0314 to Partner B, who, approximately two minutes later, forwarded the routing number to Hospital A VP with the subject line "Wire # . . . here is the wire number to ensure shipment happens right away." According to Fifth Third Bank's website, XXXXX0314 is a Fifth Third affiliate routing number for the Cincinnati, Ohio region. After receiving the routing number, according to email records, a Hospital A employee confirmed via email that the routing number was valid for wire transfers.

---

experience and training, and the experience and training of other law enforcement agents in this investigation.

27.     The next day, on or about March 31, 2020, Hospital A wired $2,495,000 to **Subject Account 1**, which was the account number HAGGERTY listed in the March 30, 2020 invoice he emailed to Partner B. At that time, according to representatives from Hospital A, Hospital A was unaware that **Subject Account 1** was in At Media's name, not At Diagnostic's. Had Hospital A known this information at the time, according to Hospital A representatives, it would not have wired the funds to **Subject Account 1**.

28.     According to bank records, on or about March 31, 2020, **Subject Account 1** was overdrawn and had a negative balance of approximately ($4,858) before Hospital A's $2,495,000 wire was deposited into the account. **Subject Account 1** had negative balances of approximately ($82,072) at the end of January 2020 and ($6,888) at the end of February 2020.

29.     According to bank records, on or about March 31, 2020, HAGGERTY opened a separate account at Fifth Third in the name of "At Diagnostic Holdings" ("Haggerty AD Account 1") for which he was the sole signatory. Haggerty AD Account 1 bore a different name and account number than **Subject Account 1**, and was funded on about March 31, 2020 with a $1,000 transfer from **Subject Account 1**.

**HAGGERTY Misappropriates Funds Hospital A Wired to Subject Account 1**

30.     The next day, on or about April 1, 2020, according to bank records, the following withdrawal or transfer activity occurred in **Subject Account 1**:

a.      Approximately $60,690 was paid to three credit card companies.

11

b.      Approximately $50,000 was transferred to **Subject Account 3**. According to Fifth Third Bank personnel, **Subject Account 3** is a business checking account in the name of "Car Dealer Benefits Incorporated" for which HAGGERTY and his spouse are the sole signatories. According to Illinois Secretary of State records for a domestic corporation by the same name, HAGGERTY's spouse is listed as the registered agent.

c.      Approximately $20,000 was paid by check to an individual who, according to Partner A and Partner B, was HAGGERTY's girlfriend.

d.      Approximately $5,809 was paid to Home Depot.

e.      Approximately $6,000 was withdrawn via a check written to cash.

31.    According to bank records for **Subject Account 1** and Fifth Third personnel, during the approximate period from April 2, 2020 to April 28, 2020, HAGGERTY cashed 17 checks for approximately $141,750 in cash as depicted in the table below. Each check was cashed on a different day, and none was larger than $10,000. I know that under the Bank Secrecy Act, financial institutions must report customer cash withdrawals over $10,000 to the U.S. Treasury's Financial Crimes Enforcement Network. Based on my training, experience, and familiarity with the investigation, including HAGGERTY's admissions to Partner B described below, I believe that the pattern of cash withdrawal activity depicted below in **Subject Account 1** is consistent with attempts to conceal the withdrawal activity from law enforcement.

12

## Checks

* Indicates gap in check sequence   i = Electronic Image   s = Substitute Check

| Number | Date Paid | Amount | Number | Date Paid | Amount |
|--------|-----------|--------|--------|-----------|--------|
| 0000 i | 04/01 | 6,000.00 | 0000*i | 04/15 | 8,300.00 |
| 0000*i | 04/02 | 7,000.00 | 0000*i | 04/16 | 8,350.00 |
| 0000*i | 04/03 | 8,000.00 | 0000*i | 04/17 | 8,300.00 |
| 0000*i | 04/06 | 8,500.00 | 0000*i | 04/21 | 8,300.00 |
| 0000*I | 04/07 | 7,500.00 | 0000*i | 04/22 | 9,300.00 |
| 0000*i | 04/08 | 8,200.00 | 0000*i | 04/23 | 8,700.00 |
| 0000*i | 04/09 | 8,500.00 | 0000*i | 04/24 | 8,400.00 |
| 0000*i | 04/10 | 8,700.00 | 0000*i | 04/27 | 8,600.00 |
| 0000*i | 04/13 | 8,300.00 | 0000*i | 04/28 | 8,800.00 |

32. On or about Tuesday, April 6, 2020, according to bank records, approximately $50,000 was transferred from **Subject Account 1** to **Subject Account 2**. According to Fifth Third Bank records, **Subject Account 2** was a joint money market checking account in the name of HAGGERTY and HAGGERTY's spouse for which HAGGERTY, HAGGERTY's spouse, and another individual were listed as signatories.

33. On or about Tuesday, April 7, 2020, the day after the original estimated delivery date for the masks Hospital A ordered, Partner B sent a text message to Hospital A VP stating that the masks should be delivered "tomorrow or Thursday."

34. On or about April 9, 2020, according to bank and car dealership records that include a copy of HAGGERTY's Illinois drivers' license, HAGGERTY purchased **Subject Vehicle 1** for approximately $39,999, which amount HAGGERTY paid by a check drawn from **Subject Account 1**.

35. On or about that same day, according to bank records, approximately $100,000 was transferred from **Subject Account 1** to **Subject Account 2**.

13

36.    On or about April 10, 2020, according to bank and car dealership records that include a copy of HAGGERTY's Illinois driver's license, HAGGERTY purchased **Subject Vehicle 2** for approximately $52,959 which amount HAGGERTY paid for in part by a Fifth Third cashier's check for approximately $32,759 drawn from **Subject Account 1** on or about April 10, 2020, and approximately $20,200 charged to a credit card.

37.    On or about that same day, according to bank records, approximately $127,844 was withdrawn from **Subject Account 1** and paid to Bank of America for what, based on Fifth Third Bank statement entries, appears to be a credit card in the name of HAGGERTY's spouse.

38.    On or about Saturday, April 11, 2020, according to text message and Hospital A VP, Hospital A VP, having received none of the 500,000 3M N95 masks Hospital A had ordered, texted Partner A, who had since been released from the hospital and was under quarantine in Florida, that on "Monday morning we [Hospital A] will be asking to remove all of our money [$2,495,000] from escrow."

39.    On or about Monday, April 13, 2020, at approximately 9:16 a.m., according text messages, Hospital A VP sent a text to Partner A stating that Hospital A was "going to ask for our money [$2,495,000] to be returned."

40.    Shortly thereafter, according to Partner A, after Partner A leaned that Hospital A wired the $2,495,000 to **Subject Account 1**, Partner A spoke to HAGGERTY on the phone and instructed HAGGERTY to refund the $2,495,000 to

14

Hospital A. HAGGERTY replied that the funds had not yet been deposited into **Subject Account 1**. At the time, according to Partner A, Partner A believed **Subject Account 1** was in the name of At Diagnostics because HAGGERTY had previously told Partner A that HAGGERTY opened a Fifth Third bank account in the At Diagnostics' name. As noted above, on or about March 31, 2020, HAGGERTY opened Haggerty AD Account 1 in At Diagnostic's name approximately a day after he provided wiring instructions to Hospital A that listed **Subject Account 1** (in At Media's name) as an At Diagnostic's account.

41.    Later that day, at or around 2 p.m., according to Partner A, Partner A called HAGGERTY to ask about the status of Hospital A's wire. On the call, HAGGERTY stated that the $2,495,000 had not yet been deposited into **Subject Account 1**. Telephone toll records for April 13, 2020 show multiple calls between the phone numbers used by Partner A and Haggerty Phone 1.

42.    After the call, according to email records and Partner A, at approximately 2:13 p.m., HAGGERTY, using Haggerty Email 1, emailed Partner A what appeared to be a March 31, 2020 Fifth Third account statement for **Subject Account 1** showing a balance of approximately $1,000. According to Partner A, Partner A believed that HAGGERTY sent this bank statement to show Partner A that Hospital A's $2,495,000 had yet to be deposited in the At Diagnostics account at Fifth Third. In the body of the purported statement, the document purports to be an "Account Summary of [the account number for **Subject Account 1**]" in the name of

15

"At Diagnostic Holdings." The statement shows a balance of $1,000. In the upper right-hand of the document, the purported statement lists the account number for Haggerty AD Account 1, not **Subject Account 1**. Based on my training, experience, and familiarity with the investigation, including my review of the bank records for **Subject Account 1** and Haggerty AD Account 1, as well as HAGGERTY's later admissions to Partner A described below, I believe HAGGERTY altered the March 31, 2020 statement for Haggerty AD Account 1 to make it look like an "At Diagnostics Holdings" statement for **Subject Account 1**, and that HAGGERTY altered the statement in order to conceal (1) evidence that Hospital A's $2,495,000 wire transfer had been deposited into **Subject Account 1**, and (2) that **Subject Account 1** was in At Media's name, not At Diagnostic's.

43.     Later that afternoon, at approximately 3:34 p.m., Partner A sent an email to Hospital A VP, copying HAGGERTY, stating that Partner A could not locate any record of Hospital A's $2,495,000 wire payment in the escrow account Partner A used to hold funds for At Diagnostics transactions. According to Partner A, at the time, Partner A believed the bank statement HAGGERTY sent was legitimate, and that Partner A was unaware that HAGGERTY instructed Hospital A to wire the funds to an account in At Media's name.

44.     On or about that same day, according to bank records, approximately $1,644,838 was transferred from **Subject Account 1** to **Subject Account 3**.

**HAGGERTY Conceals His Misappropriation from Hospital A**

45. The next day, on about April 14, 2020, according to Hospital A VP and Partner A, a phone conversation between Hospital A VP, Partner A, and HAGGERTY took place, during which:

      a. Hospital A VP asked for an update on return of the $2,495,000 and stated that Hospital A VP was considering engaging Hospital A's legal team.

      b. Partner A stated, based on earlier representations from HAGGERTY, that HAGGERTY had been working with Fifth Third Bank throughout the day to track the location of Hospital A's $2,495,000 wire payment.

      c. HAGGERTY stated that he had spoken with Fifth Third a few hours ago, that Fifth Third was performing a "skip trace" on the wire, and that HAGGERTY would provide an update as to the funds' location as soon as he received one from Fifth Third. According to telephone toll records, there were no phone contacts between Haggerty Phone 1 and any known Fifth Third Bank phone number during the approximate period from January 1, 2020 through April 26, 2020.

46. The next day, on or about April 15, 2020, according to Hospital A VP, HAGGERTY communicated to Hospital A VP that he had a call with Fifth Third that morning to get an update on the skip trace and that the bank had previously told HAGGERTY that the skip trace could take 24 to 48 hours.

47. On or about April 21, 2020, according to Hospital A VP and email records, HAGGERTY, using Haggerty Email 1, emailed Hospital A VP stating that

17

he "spoke to [Fifth Third] bank yesterday afternoon," that the "CPHS number for [Hospital A's wire payment] was un [not] found out [at] Fifth Thirds end," and that he asked Fifth Third "to run a trace on your origination account number to see if the funds were caught in the clearing house mechanism." HAGGERTY further stated that Fifth Third "said it could take up to 72hrs for that [trace] to come back. As soon as we have an update we will let you know."

48.    On or about May 5, 2020, according to Hospital A VP and email records, Hospital A VP emailed HAGGERTY stating that Hospital A confirmed with its bank that the $2,495,000 was deposited into **Subject Account 1**. Attached to the email was a wire trace from Hospital A's bank. HAGGERTY replied, "I will speak with [Fifth Third] bank today with regards to the skip trace initiated for your transaction."

49.    On or about May 6, 2020, Hospital A VP sent an email to HAGGERTY, using Haggerty Email 1, asking if he had heard from Fifth Third bank. HAGGERTY replied, "[Fifth Third] bank was going to finish there due diligence on the skip trace and work with [Hospital A's bank] . . . . [Fifth Third] expect it closed by mid next week when I spoke with [Fifth Third Employee A] late yesterday."

50.    According to Fifth Third Employee A and bank records, HAGGERTY did not contact Fifth Third Employee A or any other Fifth Third representative regarding skip tracing or Hospital A's $2,495,000 wire payment during the approximate time periods described above.

18

51. Based on my training, experience, and familiarity with the investigation, including my review of the bank records for **Subject Account 1** and **Subject Account 2**, including the post-March 31, 2020 transfer of funds out of **Subject Account 1** described above and HAGGERTY's later admissions to Partner A described below, I believe that HAGGERTY knew that Hospital A's wire had been received into **Subject Account 1**, and that his statements to Hospital A about skip tracing were misrepresentations intended to conceal HAGGERTY's misappropriation of Hospital A's funds.

52. On or about May 14, 2020, according to email records, Hospital A VP sent an email to HAGGERTY, using Haggerty Email 1, stating, "I need to hear from you by tomorrow or we are likely to take other action on this issue [the unreturned $2,495,000 Hospital A wired to **Subject Account 1**]." HAGGERTY replied, "[L]et me know when you guys have received the funds returned from the [Fifth Third] clearing house."

53. On or about June 2, 2020, according to Partner A, Partner B, and text messages, Partner A texted HAGGERTY to "call us [Partner A and Partner B] ASAP [regarding Hospital A's funds]." After HAGGERTY replied that he would be free in five minutes, Partner B texted, "We don't have 5 mins, we need the bank [Fifth Third] (not us but someone from the bank) to prove us with documentation [regarding Hospital A's wire payment] now !!!!! This can not wait, they [Hospital A] are reporting [At Diagnostics to law enforcement]."

19

54.    On or about that same day, according to Fifth Third Employee A, Partner A emailed and called Fifth Third Employee A seeking information about whether a wire transfer had been received into **Subject Account 1**. Fifth Third Employee A declined to provide any information because Partner A was not a signatory to **Subject Account 1** and advised Partner A to contact HAGGERTY. HAGGERTY emailed Fifth Third Employee A[5] requesting that Partner A be added to Haggerty AD Account 1 and provided with any information about that account. According to Fifth Third Employee A, at about this approximate time, HAGGERTY had a phone call with Fifth Third Employee A during which HAGGERTY instructed Fifth Third Employee A not to give Partner A any account information for **Subject Account 1**.

55.    On or about June 3, 2020, according to Partner A and a civil complaint filed against HAGGERTY in the DuPage County Circuit Court (Case 20 CH 469), HAGGERTY told Partner A over the phone that Hospital A's funds had been deposited into the At Media account **(Subject Account 1)**, that HAGGERTY had been aware of this, that HAGGERTY had "fucked up," and that HAGGERTY had lied to Hospital A VP, Partner A, and Partner B. During a meeting with HAGGERTY later that day at a restaurant in Oakbrook, Illinois, according to Partner A, Partner A instructed HAGGERTY to return Hospital A's funds, and HAGGERTY replied that

---

[5] Fifth Third Employee A read this email to FBI agents during a telephone interview. The email itself has been subpoenaed but not yet received or reviewed.

approximately $600,000 of Hospital A's funds remained in **Subject Account 1**. Telephone toll records from June 3, 2020 show calls between the phone number used by Partner A and Haggerty Phone 1.

56.    On or about June 3, 2020, June 5, 2020, and June 18, 2020, according to Hospital A representatives and bank records, HAGGERTY wired approximately $500,000, $100,000, and $250,000 to Hospital A, respectively. To date, Hospital A has not been refunded approximately $1,645,000 of the $2,495,000 it deposited into **Subject Account 1**.

57.    On or about June 3, 2020, according to a Willowbrook police report and Partner A, Partner A and Partner B reported HAGGERTY's conduct to the Willowbrook police department as a possible theft that occurred at **Subject Premises 1**.

### Hospital B's $1,245,100 Order for PPE

58.    In or around late March 2020, in response to the COVID-19 pandemic, representatives for Hospital B were looking to quickly secure large quantities of PPE for staff and patients. As discussed below, Hospital B placed two separate orders with At Diagnostics for N95 masks. At Diagnostics did not fulfill the first order and refunded Hospital B's money. At Diagnostics also did not fulfill the second order, but for that order, HAGGERTY converted at least some of the funds for his own use, as discussed below.

21

59.     On or about March 27, 2020, according to email records and Hospital B employees, Hospital B agreed to purchase approximately 1 million 3M N95 masks from At Diagnostics for approximately $4,990,000. The purchase agreement stated that payment would be "escrow," that "escrow funds will be released upon delivery of products," and to contact HAGGERTY with any questions. According to a Hospital B employee, Partner A advised a Hospital B employee that HAGGERTY was his partner and that Hospital B should deal with HAGGERTY regarding any payments for PPE.

60.     On or about March 30, 2020, according to email records and Hospital B employees, a Hospital B employee sent an email to Partner B requesting that At Diagnostic register with Paymode X, the bank-based payment system Hospital B used. Partner B replied, copying HAGGERTY, using Haggerty Email 1. At approximately 12:25 p.m., HAGGERTY, using Haggerty Email 1, emailed the Hospital B representative that "[o]ur Holding company AT media is registered with paymode x from our other customers. . . . This would be the fastest way to proceed with procurement of the PO [purchase order]." In the email, HAGGERTY provided a Paymode membership number that, according to Paymode and bank records, was linked to **Subject Account 1** and listed HAGGERTY as the sole authorized user. Based on my training, experience, and familiarity with the investigation, including the Illinois Secretary of State records and corporate records discussed above, as well

22

as Partner A, I do not believe that At Media Inc. was a holding company for At Diagnostics Inc.

61. About two hours later, at approximately 2:54 p.m., HAGGERTY, using Haggerty Email 1, emailed a Hospital B employee "info for the Paymode account we have set up. . . At Media Inc. . . . Last 4 Digits of Tax ID: 0407."

62. A short while later, at approximately 3:20 p.m., Partner B emailed an updated invoice to Hospital B, copying HAGGERTY, stating that "[s]ince our escrow didn't work [the initial proposed escrow agent fell through] 3M won't produce and ship without 50% deposit and then other 50% will be collected once masks are received." The attached invoice – which contained the same wiring instructions HAGGERTY emailed to Partner B earlier that day in relation to Hospital A's order – was for $2,495,000, 50% of the purchase price for the 1 million masks. It instructed Hospital B to call HAGGERTY with any questions and wire the payment to:

> At Diagnostics
> Fifth Third Bank
> RT # XXXXXX09
> Acct # XXXXXX9072

As noted above in paragraph 22, the 9072 account, **Subject Account 1**, was in the name of "At Media Inc.," not At Diagnostics.

63. On or about April 2, 2020, according to email records and Partner A, Hospital B informed Partner B and HAGGERTY that Hospital B preferred to use an escrow agreement through Chase Bank.

23

64.     On or about April 7, 2020, according to email records and Partner A, HAGGERTY signed an escrow agreement with Hospital B on behalf of At Diagnostics in which Hospital A agreed to deposit approximately $2,495,000 into escrow at Chase Bank, with any disbursements to At Diagnostics to be made to an attorney trust account at Chase Bank controlled by Partner A, who was still under quarantine in Florida.

65.     On or about April 8, 2020, according to email records and Partner A, Hospital B released approximately half of the $2,495,000 in escrow into Partner A's attorney trust account at Chase Bank. On or about May 1, 2020, after having received none of the N95 masks it ordered from At Diagnostics on or about April 7, 2020, Hospital B notified Partner A that it was cancelling its April 7, 2020 order and requested the return of all funds paid into Partner A's attorney trust account. By on or about May 5, 2020, Partner A returned all the funds Hospital B had released from escrow for the April 7, 2020 PPE order.

66.     On or about May 7, 2020, according to email records, Hospital B employees, and Partner A, Hospital B placed a second order with At Diagnostics for 500,000 3M N95 face masks. In response, Hospital B received an initial purchase order agreement from Partner A. The initial purchase order stated that Hospital B agreed to purchase 500,000 3M N95 masks for $2.49 per mask, for a total of approximately $1,245,100, and that a deposit of approximately $311,275 was due within five days of order confirmation, with the remaining balance (approximately

24

$933,825) due after delivery of the masks. The initial purchase order listed HAGGERTY as the person to contact with any questions about the order, and listed **Subject Premises 1** as At Diagnostic's address.

67. According to email records, on or about May 18, 2020, and after making some revisions, Hospital B and Partner A signed the purchase order. The executed purchase order did not mention HAGGERTY or **Subject Premises 1**, and stated that the $311,275 deposit was due within five days or order confirmation, and the remaining balance (approximately $933,825) was due ten days after delivery.

68. According to Hospital B employees and Partner A, Hospital B and At Diagnostics agreed that Hospital B would be entitled to a full refund if Hospital B did not receive the PPE by in or around mid-July 2020.

69. On or about May 22, 2020, according to Hospital B employees email records, Hospital B wired approximately $311,275 to Partner A's attorney trust account as a deposit on its May 22, 2020 purchase order.

70. On or about June 9, 2020, according to Hospital B employees and bank records, Hospital B's payment system, Paymode X, wired approximately $933,825 – the remaining balance on the May 18, 2020 order – into **Subject Account 1**. According to Hospital B employees, because the balance was not due until after delivery and because no masks had been delivered, Hospital B's payment system erroneously released these funds into **Subject Account 1**. The Fifth Third Bank

25

statements for **Subject Account 1**, which were addressed to the **Subject Premises**, listed the $933,825 deposit as "[Hospital B] PMD PAYMENT."

**HAGGERTY Misappropriates Funds Hospital B Wired to Subject Account 1**

71.     After **Subject Account 1** received the $993,825 from Hospital B, on or about June 18, 2020, as noted above, HAGGERTY wired approximately $250,000 from **Subject Account 1** to Hospital A as a partial refund of the $2,495,000 deposited into **Subject Account 1** for masks that were never delivered.

72.     On or about June 30, 2020, according to bank and car dealership records, HAGGERTY purchased **Subject Vehicle 3** for approximately $39,561, which amount HAGGERTY paid in part by a check drawn from **Subject Account 1** for approximately $22,151.

73.     On or about July 16, 2020, Hospital B cancelled the May 18, 2020 purchase order because no masks had been delivered by July 16, 2020. On or about that same day, according to bank records and Partner A, Partner A returned to Hospital B the approximately $311,275 Hospital B deposited into Partner A's account on or about May 22, 2020.

74.     On or about July 21, 2020, according to Hospital B employees, Hospital B employees became aware that its Paymode X system erroneously released approximately $933,825 to **Subject Account 1**, and a Hospital B employee sent Partner A an email advising him/her of the erroneous payment.

75. On or about July 23, 2020, according to email records and Partner A, Partner A emailed a Hospital B employee that "[i]t appears the funds were paid to a company called At Media, which we believe is owned by a previously terminated employee, Dennis HAGGERTY. Account information for anything associated with that entity should have never been provided or utilized."[6]

76. On or about July 24, 2020, according to email records and Hospital B employees, a Hospital B employee sent HAGGERTY an email asking HAGGERTY to return the approximately $933,825 that was erroneously deposited into **Subject Account 1**. The Hospital B employee did not receive a response from HAGGERTY.

77. On or about July 24, 2020, according to a Hospital B employee and telephone toll records, the employee spoke with HAGGERTY over the phone and asked him to return the $933,825 erroneously deposited into **Subject Account 1**. HAGGERTY replied that he would return the funds that same week. Thereafter, the Hospital B employee left messages for HAGGERTY regarding the status of the funds. HAGGERTY did not respond to those messages.

78. According to bank records and Hospital B employees, HAGGERTY has not returned to Hospital B any of the approximately $933,285 that Hospital B deposited into **Subject Account 1** on or about June 9, 2020.

---

[6] As noted above, prior to this email, Partner A reported HAGGERTY's conduct to a local police department on or about June 3, 2020. On or about June 9, 2020, according to Partner A and a civil complaint filed against HAGGERTY in DuPage Circuit Court (case number 20 CH 469), At Diagnostics send HAGGERTY a letter terminating him as an officer and manager of At Diagnostics.

79.     Based on my training and experience working on white-collar cases, I believe that the wire fraud offense summarized in this affidavit would likely have an effect on interstate commerce and involve an interstate wire communication. For example, as noted in paragraph 27, Iowa-based Hospital A wired its payment for PPE to Illinois-based **Subject Account 1**, and as noted in paragraphs 43 through 52, Illinois-based HAGGERTY had phone and email communications with Iowa-based Hospital A VP.

80.     Additionally, based on my training and experience, the search of electronic devices involved in fraudulent activities often contain evidence of those activities, including (1) stored email communications related to the fraud; (2) stored financial records and ledgers which may show fraud proceeds or the flow of funds related to the fraud; and (3) copies of fraudulent or altered documents that were created as part of the fraud scheme.

81.     As set forth in this affidavit, it is believed the facts set forth establish probable cause that HAGGERTY has committed the **Subject Offense** and that he funded the **Subject Accounts** and purchased the **Subject Vehicles** with proceeds traceable to the **Subject Offense.**

### The Subject Premises

82.     The **Subject Premises** consists of two office suites that are adjacent to each other, 7656 Plaza Court (**Subject Premises 1**) and 7660 Plaza Court (**Subject**

28

**Premises 2**) in Willowbrook, Illinois. The suites both have external entrance doors which share a common landing, as depicted in Attachments A-1 and A-2.

83.    As noted above, **Subject Premises 1** was listed as At Diagnostics' address on invoices and purchase orders sent to Hospital A and B, as well a Willowbrook police report in response to a theft complaint by Partner A and Partner B.

84.    Partner A and Partner B told law enforcement that they met with HAGGERTY at HAGGERTY's office in Willlowbrook, Illinois earlier this year, and that HAGGERTY told them that he maintains an office for At Media at that location. According to Partner B, when Partner B visited HAGGERTY at that Willowbrook officer earlier this year, HAGGERTY told Partner B that he used the adjacent office suite for storage.

85.    On or about October 7, 2020, agents conducting surveillance saw **Subject Vehicle 2** in the parking lot directly in front of the **Subject Premises** and a white male enter the **Subject Premises 1** before departing in **Subject Vehicle 2**. On or about October 21, 2020, agents conducting surveillance saw an individual agents believed to be HAGGERTY, whom agents identified based on a comparison to his Illinois driver's license photo, leave the driver's door of **Subject Vehicle 2** and enter the **Subject Premises 1**. On or about October 23, 2020, agents conducting surveillance saw **Subject Vehicle 2** parked in front of the **Subject Premises** and later HAGGERTY and another individual walking back and forth between the

adjacent doors marked "7656" (**Subject Premises 1**) and "7660" (**Subject Premises 2**) of the **Subject Premises**.

86.     On or about October 27, 2020, agents outside the **Subject Premises** saw a sign on the door marked "7660" (**Subject Premises 2**) that read "Please deliver mail for At Media, At Health Solutions to this office." Based on my training, experience, and familiarity with this investigation, including the sign of the door on 7660 Plaza Court and HAGGERTY's statement to Partner B that he used the adjacent officer for storage, I believe HAGGERTY continues to use the adjacent office suites at 7656   (**Subject Premises 1**) and 7660 (**Subject Premises 2**) Plaza Court in Willowbrook.[7]

87.     HAGGERTY's activities in connection with the **Subject Offense** indicate a strong probability that evidence is likely to be found in the **Subject Premises**.  First, I know that is common for individuals to maintain receipts and other records concerning purchases of goods and services within their place of business. In this case, HAGGERTY misappropriated over $2 million in funds that were deposited into a HAGGERTY-controlled a bank account for which HAGGERTY listed the **Subject Premises** as the mailing address to which statements are sent. Surveillance has recently seen HAGGERTY at the **Subject Premises**. It is

---

[7] In order to maintain the covert nature of this investigation, law enforcement has not attempted to obtain the lease agreements for the **Subject Premises** from the landlord because the landlord may alert HAGGERTY to law enforcement's interest in the offices, which could cause HAGGERTY to remove evidence of the fraud from the offices.

reasonable to believe that HAGGERTY will have retained documents evidencing his receipt and use of the funds he misappropriated, including financial transactions conducted using the proceeds of the **Subject Offense**. Evidence of HAGGERTY's receipt and use of the proceeds of the **Subject Offense** may take several forms, including but not limited to documentation of safety deposit boxes used to store valuables; receipts for purchased goods and services; credit card statements evidencing the purchase of these goods and services; bank statements evidencing the withdrawal of amounts of cash or wire transfers of proceeds to pay for such goods and services, as well as other documents evidencing the purchase of property, such as stock certificates and titles for real and personal property. For example, as noted above in paragraphs 34, 36, and 72, HAGGERTY purchased the **Subject Vehicles** with misappropriated funds, and records relating to those transactions can evidence HAGGERTY's use of the proceeds of the **Subject Offense.** In addition, financial records, such as bank statements, bank books, certificates of deposit, wire transfers, cashier's checks, money orders, currency exchange receipts, checkbooks and brokerage and investment account records can demonstrate HAGGERTY's use of the proceeds of the **Subject Offenses**.

88.  In addition, I know from my training and experience that individuals that receive illegal income will often take steps to conceal that income, including by using accounts in nominee names, such as family members or friends. For example, evidence in HAGGERTY's possession of financial accounts (such as bank statements

31

and investment accounts) in nominee names or in overseas locations would constitute evidence of concealment of the proceeds of the unlawful activity. Moreover, the presence of these records in HAGGERTY's own business would also tend to demonstrate that HAGGERTY has knowledge of the contents of these records, whether they demonstrate the presence or absence of reference to funds illegally obtained. For the reasons provided herein, there is probable cause to believe that the **Subject Premises** will contain the items described more fully below in paragraph Attachments B-1 and B-2 as evidence, fruits and instrumentalities of the **Subject Offense**.

89.    As set forth in this affidavit, it is believed the facts establish probable cause that the below-described records, documents and items constitute evidence, fruits and instrumentalities of the **Subject Offense**, and further that a search of the **Subject Premises** will lead to the discovery of such records, documents and items.

90.    Based on my training, experience, and my familiarity the evidence gathered during the course of this investigation, including my discussions with fellow law enforcement agents, I am familiar with the means and methods of those who engage in fraudulent schemes  Among other things, I know that those engaged in the **Subject Offense**:

a.    Maintain books and records that evidence the receipt, transfer, use and concealment of illegally obtained funds, such as secret ledgers or "double books," other documents concerning earnings, income, profits, assets and liabilities,

such as bank statements, bank books, certificates of deposit, wire transfers, cashier's checks, money orders, currency exchange receipts, checkbooks, brokerage and investment account records, stock certificates, credit cards, credit card statements, appraisal documents, title documents, tax returns and tax return information, tax statements, accounting ledgers, earning statements, loan and credit applications, retirement statements, savings plan statements and other benefits statements.

b.  Maintain safes, safety-deposit boxes, keys for safety-deposit boxes, hidden compartments, envelopes, packages and other secure locations and containers, containing proceeds of illegal activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, rare coins, and other items of value, as well as books and records regarding the acquisition, use and disposition of such items of value.

c.  Maintain records that reflect the names, addresses, and/or telephone numbers of accomplices and victims involved in fraudulent schemes, as well as dates, times and locations of meetings, as well as communications with such accomplices and victims.

d.  Maintain the aforementioned books, papers, documents and other items in secure places (such as in locked or unlocked containers, toolboxes, hidden compartments, safe deposit boxes, storage lockers and garages) within their residence and vehicles so they have ready access to such information.

33

91.    Moreover, I know based on my training and experience that individuals will maintain within their businesses computers and other electronic devices capable of the electronic storage of information, including the records and documents described in paragraph 87 above. Searches of computers and the locations they are found in may also yield records concerning the ownership or use of any computer and electronic storage device in the search location.

## SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

92.    Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.    Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.　　Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

c.　　In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

d.　　In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

35

## PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

93.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachments A-1 and A-2 so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

94.     The review of electronically stored information and electronic storage media removed from the premises described in Attachments A-1 and A-2 may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

        a.      examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachments B-1 and B-2;

        b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachments B-1 and B-2 (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal

activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

      c.      surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

      d.      opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

95.      The government will return any electronic storage media removed from the premises described in Attachments A-1 and A-2 within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## CONCLUSION

96.      Based on the above information, I respectfully submit that there is probable cause to believe that (1) the defendant committed the offense alleged in the complaint, (2) that the **Subject Vehicles** and funds in the **Subject Accounts** are property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from the defendant's wire fraud offense, and thus subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(D), and (3) that there is probable cause to believe that evidence, fruits, and instrumentalities of that offense are located at the **Subject Premises**.

97.     I therefore respectfully request that this Court issue (1) warrants to seize the **Subject Vehicles** and funds not to exceed $2,658,825 in the **Subject Accounts** as proceeds directly and indirectly traceable to defendant's wire fraud offense, and (2) a warrant to search the business located at 7656 Plaza Court and 7660 Plaza Court in Willowbrook, Illinois, more particularly described in Attachments A-1 and A, authorizing the seizure of the items described in Attachment B-1 and B-2, pursuant to the protocol described in the addendum to Attachment B-1 and B-2.

FURTHER AFFIANT SAYETH NOT.

*Mary C. Harris*

MARY C. HARRIS
Special     Agent,     Federal     Bureau     of
Investigation

SWORN TO AND AFFIRMED by telephone November 9, 2020.

Honorable JEFFREY COLE
United States Magistrate Judge

38